**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>BARTOW COUNTY,<br>Defendant. | CIVIL ACTION<br>NO. 4:22-cv-00232-WMR |

## ORDER

This case is before the Court on the Magistrate Judge's Final Report and Recommendation ("R&R") [Doc. 102], which recommends that Defendant Bartow County's Motion for Summary Judgment [Doc. 70] be GRANTED and the case be DISMISSED WITH PREJUDICE. Plaintiff has filed objections to the R&R. [Doc. 108]. After a *de novo* review, and for the reasons that follow, the Court overrules the objections and adopts the findings and conclusions of the R&R as the opinion and order of the Court.

## A.    FINDINGS OF FACT

Plaintiff United States of America filed suit on behalf of Carlen Loyal ("Loyal") and Bobby Turner ("Turner"), alleging that Defendant County subjected Loyal to a racially hostile work environment ("RHWE") and subsequently

1

terminated both Loyal and Turner in retaliation for Loyal's complaint about the work environment. [Doc. 1].

**A. Facts Pertaining to Loyal's Complaint (Protected Activity)**

Carlen Loyal was a shop mechanic with the Bartow County Road Department ("the Department"). [Doc. 70-1 at ¶ 2]. On June 6, 2019, not during work hours, Kirk Ledford ("K. Ledford"), an equipment operator for the Department, accidentally sent a text from his personal cellphone to Loyal's personal cellphone. [*Id.* ¶¶ at 1, 15–17]. This text referred to Loyal, who is African-American, as a n****r.[1] [*Id.* at ¶ 15]. It is undisputed that the text was meant for someone else and that K. Ledford had never made any racist comments at work or treated Loyal any differently at work because of his race. [*Id.* at ¶¶ 17, 73–76]. The next day, Loyal reported the text message to his supervisor, Mark Boles ("Boles"), stating that he no longer wanted to be around K. Ledford at work. [*Id.* at ¶¶ 22–23]. Boles relayed the complaint to Joe Sutton ("Sutton"), the Director of the Department, who then relayed the complaint to HR. [*Id.* at ¶¶ 9, 25–28].

Later that same day, Robin Puryear ("Puryear"), the County's Human Resources ("HR") Director, held a meeting in her office with Loyal, K. Ledford, and Sutton to discuss the text message and attempt to diffuse the situation. [Doc. 70-1 at

---

[1] K. Ledford's text message included a link to a pig feed recipe and his message stated "N****r at work showed me this, I ain't tried it" [Doc. 93-20 at 2].

¶¶ 10, 31]. In that meeting, Puryear tried to explain that K. Ledford did not mean for the language he used in the text to be interpreted on a personal level by Loyal and, accordingly, she asked Loyal why he was offended by the message. Then Puryear suggested that Loyal probably heard the same words in rap songs, looked up the definition of the n-word, and asked him "is this you?" [*Id.* at ¶¶ 34, 37–45]. Based on the unintended circumstances of the text message, Puryear suggested to Loyal that he needed to just forgive and forget, reminding him that he would still have to work with Ledford, and further suggested that Loyal should just call K. Ledford "a cracker and ... be done with it." [*Id.* at ¶¶ 47, 50, 54–58]. Near the end of the meeting, Loyal indicated that he would take vacation time to avoid having to be around K. Ledford in the workplace and Puryear told him that she would deny his vacation time request if that was the sole purpose for his request. Puryear further tried to diffuse the situation by asking Loyal and K. Ledford to shake hands, and Loyal refused. After it became clear that Loyal would not reconcile with K. Ledford, Puryear asked Sutton to "keep an eye on" Loyal. [*Id.* at ¶¶ 59–60, 62–64; Doc. 93 at ¶ 98]. As Loyal was leaving the meeting, Puryear asked Loyal if he told anybody else in the workplace about the text message and Loyal indicated that he told his brother-in-law, Turner. According to Loyal, Puryear then stated "well, you shouldn't have done that." [Doc. 70-1 at ¶¶ 68–70]. Within a week, County Administrator Peter Olson ("Olson") and County Commissioner Steve Taylor

("Commissioner Taylor") were informed about the situation. [*Id*. at ¶¶ 13–14; Doc. 93 at ¶¶ 107–108].

Following the meeting, no racist comments were made to Loyal. [Doc. 70-1 at ¶¶ 81–85]. However, Loyal testified that employees did gather differently than they had before and "stood out" from him. [Doc. 79 at 37]. Loyal also claimed that Boles would send him away from his normal work area whenever K. Ledford would enter the shop. [Doc. 93 at ¶ 111]. However, Loyal also testified that K. Ledford would remain nearby whenever Loyal had to work on K. Ledford's vehicle, meaning they were in close proximity on a few occasions following the meeting. [Doc. 70-1 at ¶¶ 19–21]. Loyal also noticed Sutton around work areas more often. [Doc. 93 at ¶ 113]. Lastly, on one occasion, a coworker interrupted Loyal while he was working to tell him that K. Ledford did not really mean anything by the text message. [*Id*. at ¶ 114].

## B. Facts Pertaining to the County's Investigation Regarding Timesheets

Later in that same month, John Pickett ("Pickett"), a county road inspector, was filling in for the regular employee who reviewed the on-call timesheets and noticed that Loyal had submitted an on-call timesheet for Turner and that Turner was not on the on-call schedule for that time period. [Doc. 70-1 at ¶¶ 93–95]. Though employees on the on-call schedule were allowed to ask non-scheduled employees to assist them, Pickett believed they could only do so with Sutton's permission. [Doc.

72 at 45, 57; Doc. 92 at ¶ 95]. Therefore, Pickett flagged Turner's on-call timesheet and later brought it to the attention of Marc Ledford ("M. Ledford"), the Assistant Road Department Director. [Doc. 70-1 at ¶¶ 8, 95–96]. Pickett and M. Ledford then informed Sutton about the issue. [*Id.* at ¶ 97].

When presented with the timesheets, Sutton noticed that Loyal and Turner had claimed that they had removed a tree from Kirk Road. [Doc. 75 at 157]. Specifically, both Turner and Loyal had claimed that they spent three-and-a-half hours working at Kirk Road from 3:30am to 7:00am. [Doc. 79-2 at 37]. However, according to Sutton, just before he reviewed the timesheets he had spoken on the phone with a deputy sheriff who had been at Kirk Road for several hours waiting for someone to remove the tree from the road. [Doc. 70-1 at ¶ 99]. Sutton, recognizing that something must have been awry with Turner and Loyal's timesheets, approached both men and asked if they had, in fact, removed the tree from Kirk Road. [*Id.* at ¶ 101; Doc. 93 at ¶ 127]. Both men responded that they had. [Doc. 93 at ¶ 127]. Later, Sutton offered the men a chance to take him out to Kirk Road and show him the tree that they had removed, and Loyal declined.  Turner took him up on the offer, however, but he was unable to locate the tree. [Doc. 70-1 at ¶¶ 102-103].

Sutton then relayed the Kirk Road discrepancy to Puryear who, along with Marla Coggins ("Coggins"), the Assistant HR Director, investigated Loyal and Turner's on-call timesheets. [Doc. 70-1 at ¶¶ 12, 105]. As part of this investigation,

they reviewed GPS data provided by M. Ledford for the County vehicles that Loyal drove between June 5, 2019, to June 16, 2019, and compared it with the information listed on the timesheets. [*Id*. at ¶¶ 106–107]. Puryear also obtained and reviewed County 911 records for the same time period. [Doc. 93 at ¶ 137]. Using the GPS and 911 data, Puryear was able to verify all Road Department employees' call outs from June 5 to June 16, except for Loyal and Turner's. [*Id*. at ¶ 149]. Puryear's review revealed four instances in which Loyal's timesheets could not be corroborated.

On June 15, 2019, Loyal recorded that he spent two-and-a-half hours, from 9:00pm to 11:30pm, working on Mac Johnson Road. [Doc. 70-1 at ¶ 108]. However, GPS data did not place his County vehicle there at that time. [*Id*. at ¶ 109]. That same day, he recorded another two-and-a-half hour job from 5:00pm to 7:30pm at Zena Drive. [*Id*. at ¶ 112]. Again, GPS data did not place his County vehicle at that location at that time. [*Id*. at ¶ 113].

On June 16, 2019, Loyal submitted a timesheet claiming he spent two hours working on Cline Road from 10:00am to 12:00pm. [Doc. 79-1 at 122]. The GPS data did not show Loyal in that area at that time. [Doc. 70-3 at 13]. The same day, Loyal logged three hours, from 10:00pm to 1:00am, for work on Salacoa Road. [Doc. 70-1 at ¶ 116]. Again, however, the GPS data on his County vehicle showed he was not at that location at that time. [*Id*. at ¶ 117].

Following these discoveries, Puryear held a meeting in her conference room with Coggins, Sutton, and County Administrator Olson to discuss all of the aforementioned discrepancies, including the discrepancy in Turner's timesheet. [Doc. 70-1 ¶ 122; Doc. 76 at 114]. County Administrator Olson agreed that the GPS data did not match the timesheets that were submitted, and the group concluded that Loyal and Turner were falsifying timesheets to be paid for time that they did not work. [Doc. 76 at 114–15]. They decided, then, to review additional payroll records to see if there were any additional discrepancies and discovered several from Loyal in March of 2019. [Doc. 70-1 ¶¶ 123–25].

On March 14, 2019, Loyal logged two hours at Grogan Road, from 6:00pm to 8:00pm. [Doc. 70-1 at ¶ 126]. GPS data did not place him there at that time. [*Id.* at ¶ 127]. He also recorded six hours that same day, claiming he worked at Road 3 and Sugar Valley Road from 9:00pm to 3:00am the next morning. [*Id.* at ¶ 128]. However, GPS data showed his vehicle was only at the location from 9:15pm to 9:59pm and that it never returned. [*Id.* at ¶ 129].

On March 15, 2019, Loyal recorded that the spent three hours working at Mullinax and Griffen Roads from 7:00am to 10:00am, but GPS data did not place his vehicle at that location during that timeframe. [Doc. 70-1 at ¶¶ 130–31].

On March 16, 2019, Loyal logged three hours of work at a house on Rowland Springs Road from 9:00am to 12:00pm, but GPS data did not show his County vehicle at that location during that time. [Doc. 70-1 at ¶¶ 132–33].

Lastly, on March 17, 2019, Loyal recorded four hours of work at Snow Spring Road and Veech Loop from 8:30am to 12:30pm, yet GPS data did not show his vehicle was at that location at that time. [Doc. 70-1 at ¶¶ 134–35].

### C. Facts Pertaining to Loyal and Turner's Terminations

Following the discovery of the additional discrepancies, Puryear, Coggins, and Sutton again met with County Administrator Olson. [Doc. 70-1 at ¶ 136]. Puryear and Sutton recommended Loyal and Turner be terminated. [*Id*. at ¶ 137]. Relying solely on the summary of Puryear's and Sutton's findings, Olson recommended Loyal and Turner's termination to Commissioner Taylor. [Doc. 93 at ¶¶ 193–94, 199]. Commissioner Taylor agreed to this recommendation based upon the information presented to him. [*Id*. at ¶ 202–203].

Coggins then prepared "Notices of Commissioner Termination" for both Loyal and Turner, which were similar in content except for their names. [Doc. 77-4 at 25, 41]. The notices stated the men were being terminated for discrepancies discovered regarding their payroll records (timesheets) for on-call work from March 11, 2019, through March 24, 2019, and June 12, 2019, through June 16, 2019. [*Id*.] Loyal and Turner were terminated on June 25, 2019, and were each provided with a

Separation Agreement and General Release ("Agreement"). [Doc. 70-1 at ¶ 138] Loyal and Turner signed their respective Agreements, each providing that the County waived its rights to take legal action against them for false timesheet reporting and, in exchange, the men released the County from any and all claims relating to their employment and termination. [Doc. 79-2 at 64–67; Doc. 80 at 53–56].

### D. Facts Pertaining to the EEOC Charges and the County's Preparation of Evidence in Response

On June 27, 2019, before signing the Agreement, Loyal filed a charge with the Equal Employment Opportunity Commission. [Doc. 79-2 at 68]. According to Plaintiff, Turner later did the same on August 26, 2019. [Doc. 1 at ¶ 10].

To defend the County against these charges, Puryear asked the County's Geographic Information Services ("GIS") office to create maps illustrating the discrepancies with Loyal's on-call sheets for the calls on March 14 through 17, June 12, and June 15 through 16. [Doc. 70-1 at ¶ 139–140]. The maps were created from GPS data from Loyal's County vehicle, which Puryear provided. [Doc. 70-3 at 2–4]. An "All Readings Report," which listed the GPS locations from Loyal's County vehicle was also created after Loyal and Turner's terminations. [Doc. 77-5 at 43–66, 69–96; Doc. 77-4 at 87–171].

### E. Facts Pertaining to the Proposed Comparators

Plaintiff contends that several employees in some instances were treated better than Loyal and Turner. Among those are employees who had submitted on-call time sheets: (i) when they were not on the on-call schedule; (ii) when there was no corresponding 911 record; (iii) that did not identify where the work was completed or what County vehicle was used; and (iv) that reported on-call time for more than for hours or for more than one call per week. [Doc. 93 at ¶¶ 151–61, 214–23].

Plaintiff also listed three employees who had allegedly stolen from the County: David Robertson; Bob Wade; and Will Hicks. [Doc. 93 at ¶¶ 204, 228, 236–37]. David Robertson used a County truck to deliver fifteen tons of the County's gravel to his house and was suspended for three days without pay. [*Id*. at ¶¶ 204–209]. Bob Wade submitted six hours of call-out time on a single occasion when GPS data revealed he only worked at the reported location for about five-and-a-half hours, but he was not investigated, terminated, or disciplined. [*Id*. at ¶¶ 228–35]. Will Hicks submitted an on-call sheet claiming an hour of on-call work on a single occasion when GPS data showed his vehicle was at the Road Department all day, but the County did not take any action regarding the discrepancy in Hicks' time sheet. [*Id*. at ¶¶ 236–38].

## II. LEGAL STANDARDS

<u>Report and Recommendation</u>

Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews the R&R for clear error if no objections are filed by either party within 14 days of service. However, if a party does file objections, the Court must review *de novo* any part of the R&R to which a proper objection has been made. Fed. R. Civ. P. 72(b)(3). Since Plaintiff filed timely objections in this case, the Court reviews the challenged portions of the R&R *de novo* and the remainder of the R&R for clear error.

<u>Summary Judgment</u>

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when the record evidence shows that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A factual dispute will be considered "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247–48 (emphasis in original).

The moving party bears the burden of demonstrating that there is no genuine issue of material fact that should be decided at trial. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party meets its initial burden, then the burden shifts to the non-moving party to demonstrate that there is an issue of material fact that precludes summary judgment. <u>Id.</u> Then, summary judgment is only appropriate if the non-moving party fails to meet its burden of presenting evidence sufficient to create a genuine issue of material fact as to an essential element of its claim. <u>Celotex Corp.</u>, 477 U.S. at 323. On summary judgment, the Court views the evidence and all reasonable inferences in the light most favorable to the non-movant. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-159 (1970).

## III. DISCUSSION

### A. <u>Plaintiff's Title VII Hostile Work Environment Claim (Count I)</u>

Title VII of the Civil Rights Act of 1964 makes it unlawful for "an employer… to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The scope of Title VII "is not limited to economic or tangible discrimination," and instead "strike[s] at the entire spectrum of disparate treatment of [individuals] in employment." <u>Harris v.</u>

Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). Thus, Title VII extends to protect individuals from a hostile work environment, which is a work environment "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (citation and internal quotation marks omitted).

To prove a hostile work environment claim based on race, an employee must show that he or she (1) belongs to a protected class, (2) was subjected to unwelcome harassment, (3) the harassment was based on his or her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of his or her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment. Smelter v. S. Home Care Servs., Inc., 904 F.3d 1276, 1284 (11th Cir. 2018).

The fourth element, whether the harassment was sufficiently severe or pervasive to alter the terms of employment and create an abusive working environment, includes both a subjective and an objective component. See Harris, 510 U.S. at 21–22. This means that the work environment must be one that both the victim subjectively perceives as abusive and one "that a reasonable person would find hostile or abusive." Id. Courts look at four factors to determine whether the

workplace can be deemed objectively abusive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir.1997)). In analyzing these factors, courts must "view the evidence 'cumulatively and in the totality of the circumstances.'" Smelter, 904 F.3d at 1285 (quoting Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010)).

In this case, Plaintiff bases its RHWE claim on the following facts: (i) the single, non-work-related text message that K. Ledford inadvertently sent to Loyal during non-work hours on June 6, 2019, which contained the n-word; and (ii) some of Ms. Puryear's alleged comments that she made during her twenty-minute meeting with Loyal and others on June 10, 2019, regarding Loyal's complaint about that text message.

In the R&R, the Magistrate Judge concluded that K. Ledford's inadvertent text message was insufficient to support the RHWE claim because the text message had no connection to Loyal's work environment. Specifically, the Magistrate Judge concluded that it would be objectively unreasonable to believe that K. Ledford's use of n-word in a text message intended for someone else on one isolated occasion, and away from the workplace, was enough to permeate the workplace with

discriminatory intimidation, ridicule, and insult such that it would alter the conditions of Loyal's employment and create an abusive working environment. [Doc. 102 at 52–54].

In regard to the portion of Plaintiff's RHWE claim relating to the comments made during the meeting between Puryear, Loyal, and others regarding Loyal's complaint about the text message, the Magistrate Judge concluded that Puryear's reference to the n-word during the meeting was not objectively severe or pervasive and that Plaintiff has failed to show that any comments made during the meeting ultimately altered the terms and conditions of Loyal's employment or created a discriminatorily abusive working environment. [Doc. 102 at 54–67].

Plaintiff objects to the Magistrate Judge's above-referenced conclusions [*see* Doc. 108 at 3–16], and the Court shall address each objection in turn.

**1.** The Text Message from K. Ledford

Plaintiff objects to the Magistrate Judge's conclusion that the text message had no connection to Loyal's work environment, arguing that there was an adequate connection between the text message and the workplace since the meeting with Puryear occurred because of K. Ledford's text message. [*See* Doc. 108 at 9]. The Court acknowledges that acts outside of the workplace can be relevant to a hostile work environment claim when the acts are sufficiently connected to the workplace. *See* Meece v. Atlantic Southeast Airlines, Inc., No. 1:04-CV-3698-WSD-ECS, 2006

WL 2228937, at *2 (N.D. Ga. Aug. 2, 2006). However, the Court need not answer this question here because Plaintiff's RHWE claim is insufficient even when considering K. Ledford's text message, as will be explained below.

**2.** Whether a Reasonable Person Could Find the Conduct Severe

In its objection, Plaintiff contends that a reasonable person could perceive K. Ledford use of the n-word in the inadvertent text message, as well as Puryear's reference to the n-word during the meeting, as being severe harassment. [*See* Doc. 108 at 4–9]. The Court disagrees.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris, 510 U.S. at 23). This inquiry "requires . . . 'careful consideration of the social context in which particular behavior occurs and is experienced by its target.'" Copeland v. Ga. Dep't of Corr., 97 F.4th 766, 778 (11th Cir. 2024) (quoting Oncale, 523 U.S. at 81).

While K. Ledford's text message and the meeting with Puryear both contained improper and offensive language, this conduct, taken as a whole, is not enough to constitute objectively severe harassment under Eleventh Circuit precedent. It is true that, in analyzing the severity of the n-word in past cases, the Eleventh Circuit has described the n-word as "egregious." Smelter, 904 F.3d at 1286. Indeed, the

Magistrate Judge in the present case properly recognized that the use of the word is "repugnant." [Doc. 102 at 52]. However, it is clear that Title VII is not implicated where there is only "the mere utterance of an . . . epithet which engenders offensive feelings in an employee." Harris, 510 U.S. at 21 (internal quotation marks omitted) (quoting Meritor, 477 U.S. at 67); *see also* Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (excluding from Title VII protections "the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing") (internal quotation marks omitted).

The cases in which the Eleventh Circuit has found the use of racial slurs to constitute objectively severe harassment are notably different from the one at hand. In Smelter, for example, the Eleventh Circuit held that a reasonable jury could conclude that the plaintiff's harassment was severe when her coworkers made consistent racial remarks, including one directly calling the plaintiff a "dumb black n****r." Smelter, 904 F.3d at 1285–86. The court emphasized that "this word is particularly egregious when *directed toward a person* in an offensive or humiliating manner," and emphasized that the plaintiff's coworker "did not simply use the epithet in [the plaintiff's] presence." Id. (emphasis added). And, in Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240 (11th Cir. 2014), the Eleventh Circuit distinguished between instances where employees had regularly experienced racial epithets being used by supervisors and personally observed the confederate flag and a noose in their

workplace from other instances where employees had merely heard slurs "only a few times" or had slurs "not directed toward" them in determining what constitutes severe harassing conduct. <u>Adams</u>, 754 F.3d at 1252–57 (11th Cir. 2014). *See also* <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1277 (11th Cir. 2002) (finding harassing conduct sufficiently severe when, rather than "overhearing occasional, off-color comments," plaintiff was regularly called derogatory names by coworkers when they were arguing with him, were mad at him, or were taunting him).

While the distinction of whether racially disparaging comments were directed at the employee is pertinent, it is not entirely dispositive. The Eleventh Circuit has, on occasion, found disparaging comments not directed at the plaintiff sufficiently severe for the purposes of a hostile work environment claim. *See, e.g.,* <u>Fernandez v. Trees, Inc.</u>, 961 F.3d 1148, 1154 (11th Cir. 2020); <u>Reeves</u>, 594 F.3d at 811. However, these cases are distinguishable, as they found the non-direct comments sufficiently severe only when frequently used, targeted at the plaintiff's protected group as a whole, and continuing after employees' complaints. *See* <u>Fernandez</u>, 961 F.3d at 1154 (emphasizing the plaintiff's coworker had "often in vulgar terms[,] disparaged, ridiculed, and insulted all the employees in a protected class and persisted in doing so despite . . . complaints"); <u>Reeves</u>, 594 F.3d at 811 (stating it was "enough to hear co-workers *on a daily basis* refer to female colleagues as 'bitches,' 'whores,' and 'cunts,' to understand that they view women negatively"

and noting the "conduct persisted unabated" even after the plaintiff's complaints) (emphasis added).

Though Plaintiff contends that Loyal "was the target of direct, egregious harassment," [Doc. 108 at 8], it is important to note here that Loyal was never *directly* called a racial epithet. While it is undisputed that K. Ledford's use of the n-word in his text message was in reference to Loyal, it is also clear that he did not intend to send the message to Loyal or call Loyal the n-word directly. There is also no evidence that K. Ledford engaged in any discriminatory conduct towards Loyal in the workplace wither before or after the inadvertent text message. Additionally, though Plaintiff argues that Puryear during the meeting in response to Loyal's complaint about the text message "came exceedingly close to using the slur by reading the definition [of the n-word] aloud" [*id*. at 9], Puryear ultimately did not call Loyal a racial epithet during the meeting. And, because Loyal's complaint to HR was based on K. Ledford's use of the offense term in the text message, it was not objectively unreasonable for that offensive term to be mentioned or spoken aloud at the meeting when addressing Loyal's complaint. While Puryear's reading of the definition and her additional statements during the meeting (such as her suggestions that Loyal should not be offended and that he likely heard the same word used in rap music) may have been insensitive, misguided, or unprofessional, they do not amount to objectively severe conduct under Eleventh Circuit precedent. At most, when

considering Puryear's comments as a whole and in the context in which they were made, it appears that Puryear was merely trying to diffuse the situation and encourage Loyal to accept K. Ledford's apology because they had to work around one another in the workplace.

In sum, there is no evidence of frequent, targeted, or continually harassing workplace conduct present in this case, and neither the text message nor the off-hand comments during the meeting with Puryear rise to the level of constituting "objectively severe" harassment.

**3.** <u>Facts Pertaining to Whether a Reasonable Person Could Find the Conduct Humiliating</u>

Courts must also consider whether the allegedly harassing conduct was "physically threatening or humiliating" as opposed to a "mere offensive utterance." <u>Mendoza</u>, 195 F.3d at 1246. Here, Plaintiff contends that a reasonable person could perceive their conduct as humiliating because Loyal was the only African-American person in the meeting, that he was forced to sit next to K. Ledford while being urged to put the situation behind him, and that he was asked to shake K. Ledford's hand even after his dissent over the situation was clear. [Doc. 108 at 9–13]. The Court is unpersuaded by these facts.

The Eleventh Circuit has noted that the level of humiliation may be enhanced when "derogatory comments…[are] made in the presence of co-workers."

Fernandez, 961 F.3d at 1155. However, humiliation is typically found in more egregious circumstances than those present in this case. For example, in Miller, the Eleventh Circuit found harassment sufficiently humiliating when coworkers uttered racial slurs "directed at [the plaintiff] and "sometimes . . . in the course of reprimanding him in front of others." Miller, 277 F.3d at 1277. Similarly, in Fernandez, the plaintiff's harassment was found to be sufficiently humiliating because his coworker "frequently degraded Cuban workers, including [the plaintiff], in meetings and in front of other teams of workers at job sites." Fernandez, 961 F.3d at 1155.

Here, in contrast, Loyal was subjected to what he believed to be offensive comments in front of others only once—during the meeting in Puryear's office regarding Loyal's complaint about the text message. Additionally, the only people in that meeting were those that were involved in addressing the situation—K. Ledford (the co-worker who sent the text message that formed the basis for Loyal's complaint) and Sutton (the Director/supervisor who ultimately received the complaint and forwarded it to HR). This scenario is entirely distinct from those in which random, off-handed racial slurs were directed at an employee in the workplace in front of multiple, uninvolved coworkers.

However, as correctly pointed out by the Magistrate Judge, even if Puryear's comments were found to be humiliating, this would be the only factor weighing in

favor of the Plaintiff regarding the RHWE claim. [Doc. 102 at 61, n. 52]. The Court concludes that Plaintiff's evidence regarding the other factors remains insufficient to withstand Defendant's motion for summary judgment.

**4.** Facts Pertaining to Whether the Conduct Unreasonably Interfered with Loyal's Job Performance

Lastly, the Court must consider whether the allegedly harassing conduct unreasonably interfered with Loyal's job performance. *See* Mendoza, 195 F.3d at 1246. Plaintiff contends that K. Ledford and Puryear's conduct interfered with Loyal's work because Puryear had asked Loyal to forgive K. Ledford, informed Loyal he and K. Ledford would still have to work together, and ultimately instructed Sutton to keep a close eye on Loyal after he would not reconcile with K. Ledford. [Doc. 108 at 13]. Additionally, Plaintiff contends that Boles occasionally sent Loyal away from his workstation so that he did not have to be around K. Ledford. [*Id.*]

The Court notes that harassing conduct need not produce "tangible effects" on employee performance to satisfy this element. Miller, 277 F.3d at 22 (citing Harris, 510 U.S. at 22). However, in addition to considering a plaintiff's subjective feelings and personal reactions to the perceived conduct, courts must also determine whether the conduct in question would have "interfered with a reasonable employee's performance of [his or] her job." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 586

(11th Cir. 2000). Otherwise "the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee." Id.

Though tangible effects on employee performance are not required, more is needed than what Plaintiff has presented in this case. There is no evidence that K. Ledford or anyone else engaged in any discriminatory conduct towards Loyal after the text message and the resulting meeting regarding his complaint. Even accepting that Loyal subjectively felt impacted by occasionally being sent away to avoid encountering K. Ledford in the workplace and by seeing Sutton around the workplace a bit more than usual, it would be objectively unreasonable to conclude that this conduct would interfere with his job performance. In fact, Boles taking steps to decrease interactions between Loyal and K. Ledford would appear to be an accommodation of Loyal's request that he not be required to work around K. Ledford, thereby ensuring he felt comfortable in the workplace. Additionally, Sutton allegedly being around more but having little to no interaction with Loyal does not reasonably constitute interference with Loyal's work. In sum, Plaintiff failed to provide sufficient evidence to show that any of the alleged conduct interfered with his job performance.

For the above reasons, the Court agrees with the findings and conclusions of the R&R that Plaintiff has failed to put forth sufficient evidence to create a genuine issue of material fact as to whether the inadvertent, off-duty text message and

resulting meeting in response that text message constituted harassment that was so severe or pervasive that it created a racially discriminatory working environment. Accordingly, Defendant is entitled to summary judgment as to Plaintiff's RHWE claim in Count I.

## B. **Plaintiff's Title VII Retaliation Claims (Counts II-III)**

In addition to prohibiting discrimination, Title VII also makes it unlawful for an employer to retaliate against an employee "because he has opposed any...unlawful employment practice...or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation, a plaintiff must show that "(1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (citing Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)). Regarding the causation element, a plaintiff "must establish that his…protected activity was the but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

The successful establishment of a prima facie case of retaliation "raises a presumption that the employer's decision was more likely than not based upon an

impermissible factor." <u>Richardson v. Leeds Police Dep't</u>, 71 F.3d 801, 805 (11th Cir. 1995). Upon establishing a prima facie case, the burden then shifts to the employer to offer a legitimate, non-discriminatory reason for its employment decision. <u>Patterson v. Ga. Pac., LLC</u>, 38 F.4th 1336, 1345 (11th Cir. 2022). If the employer meets its burden, "the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation." <u>Id</u>.

Plaintiff objects to the Magistrate Judge's conclusion that no causal connection can be established between Loyal's protected activity and Loyal and Turner's terminations. [Doc. 108 at 17–29]. Specifically, Plaintiff objects to the Magistrate's following conclusions: (i) that Plaintiff's proposed comparator evidence was not comparable or was immaterial; and (ii) that Loyal and Turner were terminated because of their own misconduct rather than in retaliation for Loyal's protected activity. [*Id*.] Plaintiff also objects to several of the Magistrate Judge's factual findings and inferences in reaching these conclusions. [*Id*.] The Court will address each of these issues and the underlying objections in turn.

**1.** <u>Plaintiff's Proposed Comparator Evidence</u>

"In a Title VII retaliation case, a plaintiff can attempt to establish that his employer's proffered reason for its employment decision was a pretext for unlawful activity by showing that the employer treated similarly situated employees differently...." <u>Johnson v. Miami-Dade Cnty.</u>, 948 F.3d 1318, 1325–26 (11th Cir.

2020). In determining whether comparator evidence should be accepted, courts must ask whether "[the plaintiff] and [his or her] proffered comparators were 'similarly situated in all material respects.'" Lewis v. City of Union City, Ga., 918 F.3d 1213, 1218 (11th Cir. 2019). This does not require a plaintiff and his comparators to be "similar in all but the protected ways." Id. at 1227 (internal quotation marks omitted) (quoting Young v. UPS, Inc., 575 U.S. 206, 228 (2015)). However, it does require a plaintiff and his comparators to be substantively alike such that "they cannot be reasonably distinguished." Id. (internal quotation marks omitted) (quoting Young, 575 U.S. at 231). This typically includes a plaintiff and his comparators "engag[ing] in the same basic misconduct, …be[ing] subject to the same employment policy,… being under the jurisdiction of the same supervisor, … [and] sharing the plaintiff's employment or disciplinary history." Id. at 1227–28.

Plaintiff contends that it has put forth sufficient evidence the prerequisites for showing that Loyal and Turner were treated less favorably than similarly situated employees. [Doc. 108 at 18–30]. In support for this argument, Plaintiff cites to evidence that other employees submitted on-call time sheets when they were not list on the on-call schedule, that many of those employees submitted timesheets that were deficient in some repects, and that other employees had been caught stealing, yet only Loyal and Turner were terminated for such behavior. [*Id*. at 18–19, 22–25; *see also* Doc. 93 at ¶¶ 151–61, 214–23]. However, as will be explained below, the

proposed comparators are not similar "in all material respects." *See* <u>Lewis</u>, 918 F.3d at 1218.

Regarding the proffered employees who had submitted on-call time sheets despite not being on the on-call schedule, lacked 911 or GPS corroboration of their on-call work, did not identify where the on-call work was completed or what vehicle was used, or reported disproportionate on-call hours on a given week [Doc. 93 at ¶¶ 151–61, 214–23], the Magistrate Judge correctly found that these allegations are immaterial and that the listed individuals are not sufficient comparators because the County did not fire Loyal and Turner for any of those reasons—Loyal and Turner were fired for lying about the work they claimed to have performed and engaging in a pattern of stealing time. [Doc. 102 at 75].

It is important to note that the particular circumstance that brought Turner and Loyal's timesheets to Sutton's attention in the first place was the honest, but possibly mistaken, belief of the *substitute* timesheet reviewer (Pickett) that Turner could not submit an on-call time sheet, without Sutton's approval, because Turner was not listed on the on-call schedule. Nevertheless, when the timesheets were presented to Sutton for his review, he noticed that Loyal and Turner had claimed on their timesheets that they had removed a tree on Kirk Road and Sutton had knowledge

that the tree was still down at that location.[2]  It is clear that this discrepancy is what served as the basis for further scrutiny of Loyal and Turner's other timesheets.  There is insufficient evidence to reasonably suggest that the County decided to further scrutinize Loyal and Turner's timesheets for any other reason.

Plaintiff attempts to rely upon Phillips v. Legacy Cabinets, 87 F.4th 1313, 1322–23 (11th Cir. 2023), for the proposition that employees committing distinct misconduct can still be deemed valid comparators. [Doc. 108 at 18–19]. However, Plaintiff's reliance is misguided, as the court in Phillips accepted the proposed comparator evidence on the grounds that the alleged uniqueness of the plaintiff's conduct turned on factual disputes as to what actually occurred. Phillips, 87 F.4th at 1322–23. Here, while Loyal and Turner may contend that they ultimately did not steal time, they have failed to dispute the fact that the County had a reasonable basis for concluding that they lied about the work they performed after being confronted with the discrepancies in their timesheets and because GPS data failed to corroborate their story about having performed the work. Therefore, the Court agrees with the Magistrate Judge that the proffered employees who had merely submitted on-call

---

[2] Plaintiff contends that the Magistrate Judge made improper credibility determinations as to Sutton's motivations for investigating Loyal and Turner's timesheets, asserting that there is a genuine issue of material fact as to when Sutton actually found out about the tree still being down on Kirk Road. [Doc. 108 at 20–21]. However, this issue is a red-herring because, regardless of the exact timing, it is undisputed that Sutton received conflicting information concerning the tree which prompted further investigation into the discrepancies in Loyal and Turner's timesheets.

time sheets that may have been insufficient in some respects are not valid comparators because those employees did not engage in "the same basic misconduct"—fraudulently claiming hours—which formed the basis for Loyal and Turner's terminations.

Plaintiff has also offered as comparators three specific employees who it contends to have also stolen from the County: David Robertson, Bob Wade, and Will Hicks. The Magistrate Judge concluded that Wade and Hicks were not proper comparators given the lack of evidence that Sutton was even aware of their alleged misconduct and the fact that the amount of time they allegedly reported was much less than the amount Loyal and Turner reported. [Doc. 102 at 75–76]. And, regarding Robertson, the Magistrate Judge concluded that Robertson was not a proper comparator, even though Robertson stole fifteen tons of gravel, because he repaid the County, apologized for his actions, and was indeed disciplined for his conduct. [*Id.* at 76]. Plaintiff objects to the Magistrate Judge's conclusions on these issues. [Doc. 108 at 22–24].

After de novo review, the Court agrees with the Magistrate Judge's conclusions that these employees are not proper comparators to Loyal and Turner. Robertson did not engage in the same basic misconduct—falsifying time sheets—as Loyal and Turner. Rather, Robertson graveled his entire driveway with the County's gravel after having been told by Sutton that, if there was a safety issue, the County

would gravel the first 20 feet of his driveway. [Doc. 93 at ¶ 207]. Yet, despite Sutton's comments on the matter, Robertson graveled his entire driveway anyway. [*Id.* at ¶ 208]. And, unlike Loyal and Turner who denied having committed any wrongdoing despite overwhelming evidence to the contrary, Robertson admitted his error, apologized for his conduct, and repaid the County for the load of gravel (some of which he might have received for free if he had given Sutton time to inspect his driveway). [Doc. 75 at 210-11]. And, Robertson was disciplined with a three-day suspension which, in the County's business judgment, was a sufficient punishment under those circumstances. [Doc. 93 at ¶ 209].

As to Wade and Hicks, each are alleged to have falsified a single timesheet, and the time that they are alleged to have falsely claimed on their respective timesheets is much less than that of Loyal and Turner. Indeed, HR's investigation into Loyal and Turner's timesheets revealed *several* instances in which Loyal appears to have falsely claimed hours on multiple timesheets. Although Turner's single fraudulent timesheet is a closer call, he is alleged to have stolen 3.5 hours of time—which is more in comparison to the alleged time that was falsely claimed by Wade (30 minutes) and Hicks (1 hour). [*See* Doc. 93 at ¶¶ 228, 232, 236–37]. Additionally, there is no evidence indicating that Sutton was even aware of Wade and Hicks' purported misconduct like he was with the conduct of Loyal and Turner.

In sum, Loyal and Turner's conduct can "reasonably be distinguished" from that of Hicks, Wade, and Robertson such that they are improper comparators. *See* Lewis, 918 F.3d at 1228. ("[A] plaintiff and [his] comparators must be sufficiently similar...[to the extent] that they cannot reasonably be distinguished") (citation and internal quotation marks omitted). Accordingly, the Court finds that the employees proffered by Plaintiff can be reasonably differentiated from Loyal and Turner and, thus, are not proper comparators.

**2.** Facts Pertaining to Whether There Was a Causal Connection Between Loyal's Protected Activity and the Terminations

Plaintiff contends that the Magistrate Judge erred in concluding there was no causal connection between Loyal's protected activity and Loyal and Turner's terminations. [Doc. 108 at 17–30]. Without any proposed comparator evidence, Plaintiff has little to rely upon to support a prima facie case of retaliation. Plaintiff attempts to assert that retaliation was the but-for cause of the terminations by questioning the veracity of Defendant's evidence establishing that it was Loyal and Turner's misconduct, rather than Loyal's protected activity,[3] which resulted in their terminations. [*Id*. at 20–22, 25–27]. The Court is unpersuaded.

---

[3] It is important to note here that Turner did not engage in any protected activity himself. Rather, the retaliation claim regarding Turner is based solely on alleged retaliation for Loyal's protected activity (complaint of discrimination).

Plaintiff first attempts to undermine Sutton's credibility about the Kirk Road investigation by asserting that "Sutton could not have received the call from the sheriff's deputy the same morning he was given [Loyal and Turner's] timesheets" and, thus, a reasonable jury could believe Sutton actually escalated the fraudulent timesheet issue because of Loyal's complaint and Puryear's statement to Sutton to "keep an eye" on Loyal. [Doc. 108 at 21]. However, Plaintiff has failed to dispute the fact that, at the time the timesheets were initially reviewed by Sutton, he noticed that Loyal and Turner had claimed on their timesheets that they had removed a tree on Kirk Road and Sutton, at some point, had learned that the tree was still down at that location. Therefore, whether the call was before he reviewed the timesheets, that same morning, or sometime later, it is undisputed that Sutton was aware of the inconsistency in the timesheets and that was what prompted further investigation of Loyal and Turner's other timesheets. In any event, it was Pickett, not Sutton, who triggered the initial review of Loyal and Turner's timesheets in the first place, and there was no evidence that Pickett was even aware of Loyal's protected activity (complaint of discrimination) or that Pickett had been instructed to keep an eye on Loyal. Therefore, Plaintiff's contention that Sutton improperly pursued the investigation into their timesheets lacks a sufficient evidentiary basis.

Furthermore, the only evidence that Plaintiff put forth in an attempt to show that Turner was retaliated against for Loyal's protected activity was Loyal's single

statement to Puryear, at the end of their meeting, that he told Turner about K. Ledford's offensive text message. But any connection between Loyal's statement to Puryear and Turner's termination is tenuous at best, given the fact that at least one other employee was told about Loyal's complaint about K. Ledford's text message [*see* Doc. 70-1 at ¶¶ 68–70] and there is no evidence to indicate that this employee was retaliated against in any way based on his knowledge of Loyal's complaint about the text message. Furthermore, Puryear never mentioned to Sutton to keep an eye on Turner and no evidence has been offered that Turner experienced any increased scrutiny except that which involved the fortuitous discovery of his falsified time sheet.

Plaintiff also suggests that the Magistrate Judge improperly resolved a disputed issue of material fact in favor of the County by concluding that the County reasonably believed its GPS data was accurate. [Doc. 108 at 23, n. 14]. However, the evidence Plaintiff proffers as to the County's GPS data is insufficient to create a genuine issue of material fact on this issue. Plaintiff solely relies upon deposition testimony which states that the County's GPS systems do not undergo regular maintenance and that GPS systems are not installed in all vehicles. [*See* Doc. 93-2 at 13–15]. That same testimony, however, further indicates that employees would inform the County whenever the GPS on a vehicle was no longer working and the County then would put in a new GPS system in that vehicle. [*Id*. at 13]. But here,

there is no evidence in this case to indicate that there were issues with the GPS system in the vehicle used by Loyal and Turner. Thus, Plaintiff's proffered evidence in no way undermines the County's reasonable belief that the GPS system in the vehicle Loyal used was accurate. Furthermore, it is clear that a GPS system was installed in the vehicle that Loyal used given that GPS data was available for Loyal's trips, the data just placed him elsewhere.

Lastly, Plaintiff argues the reports and maps relied upon by the County in support of its contention that it fired Loyal and Turner for stealing time is nothing more than post-hoc evidence that should not be considered. [Doc. 108 at 25–27]. However, as the Magistrate Judge correctly pointed out, [*see* Doc. 102 at 36–39], the fact that the reports and maps were created after the terminations is of no consequence because Coggins' and Puryear's undisputed testimony indicates that they both reviewed that same GPS data before making the decision to terminate Loyal and Turner. Instead, the evidence shows Puryear requested the reports and maps for demonstrative purposes in order to present in a clearer fashion the data that they reviewed previously as part of their investigation. As pointed out by the County, [Doc. 109 at 11], the termination notices given to Loyal and Turner supports this finding because the notices that listed the weeks in which hours were fraudulently reported aligns with the data presented in the subsequent reports and maps.

Based on the foregoing, the Court concludes that a reasonable jury could not find that Loyal's complaint was the but-for cause of Loyal and Turner's terminations and, as such, Plaintiff cannot establish a prima facie case of retaliation.

**3.** Plaintiff's "Convincing Mosaic" Argument

If a plaintiff cannot establish a prima facie case of retaliation under the McDonnell Douglas framework, he or she can still survive summary judgment by putting forth a "convincing mosaic" of circumstantial evidence "so long as the evidence raises a reasonable inference of retaliatory intent." Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1310 (11th Cir. 2023). If the evidence presented raises this inference, summary judgment is improper, no matter what form the evidence takes. Id. at 1311. While the Court must view evidence in the light most favorable to the employee in analyzing this claim, "inferences in favor of [an employee] can be based only on evidence—not on speculation," and "[a] scintilla of evidence ... is always insufficient." Id. (internal quotation marks omitted) (first quoting Martin v. Fin. Asset. Mgmt. Sys., Inc., 959 F.3d 1048, 1058 (11th Cir. 2020); then quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Plaintiff contends that it has provided enough evidence to create a convincing mosaic from which a jury could reasonably find the County's retaliatory intent.

[Doc. 108 at 30]. In support for its convincing mosaic theory, Plaintiff cites to only a few facts: (i) the fifteen-day window between Loyal's complaint and Loyal and Turner's terminations; (ii) Puryear's statement to Sutton to keep an eye on Loyal; (iii) Sutton's efforts in furthering the investigating into Loyal and Turner's timesheets; (iv) the proposed comparator evidence; and (v) the fact the men were terminated despite otherwise "solid performance records." [Doc. 108 at 31].

First, as to the close proximity between Loyal's complaint and Loyal and Turner's terminations, the Court finds that the intervening discovery of the men's misconduct fatally undermines the value of temporal proximity between Loyal's protected activity and Loyal and Turner's terminations. *See* Berry, 84 F.4th at 1312 ("intervening discovery of misconduct fatally undermines the probative value of temporal proximity between [a plaintiff's] protected activity and [his] termination"). Second, in regard to Puryear's statement to Sutton that he should keep an eye on Loyal, the Court does not find this to be convincing evidence of some sort of retaliatory motive. When this statement, which was made at the end of the meeting in regard to Loyal's complaint, is considered in the context of the conversation that took place at the meeting as a whole, it is clear the Puryear was simply trying to diffuse the situation between Loyal and K. Ledford and to get the two men to shake hands, and Loyal refused. It was then, after Loyal refused to reconcile with K. Ledford, that Puryear asked Sutton to keep an eye on Loyal. A reasonable jury

would not consider Puryear's request that Sutton monitor Loyal (which was most likely intended to ensure there was no further problems between the two men) as being retaliatory. Third, the Court has already concluded that Plaintiff failed to present sufficient evidence to show that Sutton's efforts in pursuing further investigation into Loyal and Turner's timesheets were improper. Fourth, as to the comparator evidence, the Court has concluded that the employees proffered by Plaintiff can reasonably be differentiated from Loyal and Turner and, thus, the employees are not proper comparators. Lastly, the fact the men were terminated despite otherwise solid performance records does little to overcome the clear evidence of Loyal and Turner's misconduct which formed the County's basis for their terminations. "[W]hether an employment decision is prudent or fair is irrelevant." Hudson v. Blue Cross Blue Shield of Alabama, 431 F. App'x 868, 869 (11th Cir. 2011). In sum, the Court finds that Plaintiff's evidence, or lack thereof, is insufficient to create a "convincing" mosaic from which retaliatory intent can be reasonably inferred.

## IV.    CONCLUSION

After considering the Final Report and Recommendation [Doc. 102] and Plaintiff's objections thereto, and having overruled Plaintiff's objections for reasons stated above, the Court receives the R&R with approval and **ADOPTS** its findings and legal conclusions as the Opinion of this Court. Therefore, it is hereby

**ORDERED** that Defendant Bartow County's Motion for Summary Judgment [Doc. 70] is **GRANTED** as to all claims asserted in the Complaint. The Clerk is directed to close this case.

SO ORDERED, this 25th day of March, 2025.

William M. Ray, II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE